## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action Number: 24-733

**CARLA HAVARD,**
     Plaintiff,

v.

**CITY AND COUNTY OF DENVER and**
**DENVER POLICE DEPARTMENT,**
     Defendants.

_____

## COMPLAINT

_____

Plaintiff, Carla Havard, by and through her undersigned attorneys, hereby files the following complaint against Defendants City and County of Denver and the Denver Police Department (together referred to as "Defendants"):

### PARTIES

1.　Complainant Carla Havard ("Havard") served in the Denver Police Department for 25 years, rising to the rank of Sergeant, and is an individual and a resident of Colorado.

2.　Defendant City and County of Denver ("City") is a municipality/county duly constituted under the laws of Colorado, with its principal offices located at the City and County Building, 1437 Bannock St., Denver, CO 80202.

3.　Defendant Denver Police Department ("DPD") is a municipal law enforcement entity which is part of the Denver Department of Public Safety, an agency within the City and County of Denver, with its headquarters at 1331 Cherokee Street, Denver, CO 80204.

**JURISDICTION**

4.      The purpose of this action is to redress and restrain acts or practices by Defendants that federal law deems unlawful.

5.      The Court has original jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. §1331, and 42 U.S.C. §1983.

6.      Venue for this action properly lies in the District of Colorado pursuant to 28 U.S.C. §1391(b).

**NATURE OF THIS ACTION**

7.      This case arises out of the actions of Defendants (i) in depriving plaintiff Havard of her rights under the First Amendment by retaliating against her for speaking out about matters of public concern, and (ii) discriminating against her on the basis of her gender and/or color and retaliating against her for opposing discrimination in violation of the Title VII of the Civil Rights Act of 1964 and the Fourteenth Amendment to the U.S. Constitution.   Underlying her discrimination and retaliation claims are the Defendants' actions in stereotyping her as an "angry black woman."

**FACTUAL ALLEGATIONS**

_Background_

8.      Defendant Denver Police Department, established in 1859 to maintain order in a mining camp, is the full service police department for the City and County of Denver, Colorado, which provides police services to the entire county, including Denver International Airport, and may provide contractual security police service to special districts within the county.

9.      Plaintiff Havard is a Black female who joined the Denver Police Department in April of 1998.

2

10.     One of a few Black female officer employees at the DPD, Ms. Havard was also President of the Black Police Officers Organization ("BPO") from November 2018 to August of 2023, placing her within a unique position outside the scope of her employment to raise long-standing issues, particularly with respect to race and gender.

11.     From September 20, 2018 to April of 2023, Ms. Havard was responsible for the supervision of the Citywide Impact Team of the DPD, which consisted of one sergeant (Ms. Havard), six officers, and a licensed professional counselor and/or licensed addiction counselor and whose primary purposes were: (1) immediate public safety in the form of patrol efforts and (2) long-term community engagement.

12.     The Citywide Impact Team responded to critical incident events *i.e.* officer involved shootings, multi homicides, high profile events; and provided well-rounded trauma sensitive resources to victims and community members; mitigated high 911 utilizer to reduce the strain on unnecessary city resources which in turn resulted in hundreds of reduced man hours and thousands of dollars saved in resource costs;  created the PAB employment wellness and resiliency program for employees which offered empowerment and engagement program for sworn and civilian employees; led crisis mitigation for high level city employees, city council, judges, and other city officials; created and facilitated active shooter training for department, office of emergency management, 14,000+ city employees and community groups; instructed Community self-defense training; managed and trained Crime Presentation Through Environmental Design program (CPTED) which provided services for high level citizens and organizations; led community engagement, affairs and events for the department, among other responsibilities.

13.     During the relevant period of discrimination, Commander Glenn West (hereinafter "Glenn West") was responsible for the direct oversight of Ms. Havard's work with the Citywide Impact Team.

14.     After being relieved of her position on the Community Impact Team, Ms. Havard was placed in the "made up" position of Division Chief of Administration Office, Community Ombudsman, from April 2023 to May 2023; in fact she was told to make up her own duties because DPD did not have any for this " made up " position.

15.     Ms. Havard retired from the DPD in July of 2023 because of the Defendants' treatment of her and a growing fear for her safety.

_Ms. Havard had excellent performance_

16.     In terms of performance, Ms. Havard had consistently received positive performance reviews, and had received extensive commendations for her law enforcement work from both the DPD and a broad spectrum of civilian community members.

17.     Having been featured in the media from CNN, ABC to local media outlets, Ms. Havard had a strong community reputation.

18.     Until she started speaking out strongly about race and sex discrimination and other matters of public concern, Ms. Havard had an excellent reputation in the DPD and the outside community.

_Ms. Havard spoke out about matters of public concern_

19.     Ms. Havard repeatedly spoke out about matters of public concern during the time period 2021 through 2023.

20.     In 2021, Ms. Havard spoke to DPD leadership, Dr. Lisa Calderon, community activist and Chief of Staff to Councilwoman Candi CdBaca, and others about the lack of police

4

attention to threats against CdBaca, a Hispanic gay woman, including the fact that police officers in District 2 were saying out loud in a public area that if CdBaca needed help they would not respond, essentially putting that councilwoman's life at risk.

21.    During a Women's Collective meeting held September 27, 2021, attended by many Department chiefs and other leadership staff, including Glenn West, who was the Commander of the Equity Unit, and Megan Dodge, who was the Commander of Internal Affairs, Ms. Havard publicly called for the investigation of some fellow officers regarding discrimination, harassment and sexual misconduct.

22.    Immediately following the September 27 meeting, Ms. Havard called the Employee Specialist, Becky Lambert conveying to Lambert some of the issues that had been spoken about and requested that an investigation into policy violations and criminal activity be launched as a result of what the women revealed at the September 27, 2021 Women's Collective Meeting.

23.    On May 21, 2023, Ms. Havard spoke as one of the keynote speakers for the Colorado Women's Bar Association annual conference in Beaver Creek Colorado on the topic of environments for women in workplaces where there is little or no racial or gender diversity.  She was recruited as a keynote speaker because of her advocacy around black and marginalized women experiences in the workplace.

24.    Ms. Havard mentioned that she would be a keynote speaker at the conference in a mid-April 2023 zoom meeting attended by her supervisor, Glenn West and other DPD officials, although she was not speaking as a representative of the DPD.

25.    Ms. Havard spoke out on numerous other occasions about matters of public concerns, including but not limited to the following:

5

a.      Ms. Havard spoke out to Nadine Bridges of *One Colorado* in 2021 about DPD's LGBTQ officers being harassed and subjected to offensive comments.

b.      Ms. Havard spoke to Chief of Police Pazen, Division Chief Ron Thomas and Deputy Manager of Safety Mary Dulacki, as well as to Sondra Young of the NAACP, Sylvia Murray, Executive Director of Civil Service Commission, and Regina Jackson, Community advocate, in 2021 about DPD minority hiring and recruitment practices, including speaking out about a recruiter who had been disciplined for having inappropriate sexual relationships with recruits but remained in recruitment.

c.      Also in the area of recruitment, Ms. Havard (i) complained about misrepresentation of DPD's efforts in recruiting minority applicants; (ii) questioned the training practices and the legitimacy of the report that were being presented to the Chief's office and the hiring oversight board of the Civil Service Commission; (iii) accused the recruitment unit of having no criteria for their applicant process; and (iv) complained about the lack of effort on the part of the recruitment unit to actually attract black officers.

d.      In 2021, Ms. Havard spoke to Neil Wright, owner of Capitol Cigars, and Councilman Hines about the DPD's inaction, delay and lack of flexibility addressing rampant drug use and violence in certain parts of the City affecting the businesses in that area, which are mostly minority businesses.

e.      Ms. Havard spoke with Sondra Young of the NAACP in 2020-2023, Alvertis Simmons, community leader, in 2022, Mike Anderson, former police officer,

Dr. Tracie Keesee, former Division Chief -Denver Police; VP Center for Policing

Equity, Selena Dunham, business owner, Regina Jackson, Ken Brown, Pastor of Trinity

Church, and Jeff Fard (Bro Jeff), community leaders, in 2021-2023 regarding the many

complaints of officers committing civil rights violations, particularly in District 2 and

District 5, including complaints that impact teams were profiling and stopping

predominantly black citizens without probable cause and without reasonable suspicion.

     f.    Ms. Havard spoke to the ACLU, Dr. Tracie Keesee and Nick Metz,

former Chief of Police of Aurora CO in 2021 about women officers not being covered

on calls and putting their safety at risk.

     g.    Ms. Havard spoke to the ACLU in 2021, as well as to Selena Dunham

and Dr. Tracy Keecee, Nick Metz and Dr. Terry Nelson, community leader, about Black

officers being overlooked for positions for which they were qualified, with those

positions often given to underqualified white men or white females

     h.    Ms. Havard made complaints to Alvertis Simmons in 2021-2022 and

Division Chief Ron Thomas about the allegations that District 2 police officers were

calling black community members "ni**ers" while interacting with them and that white

officers were calling black men "Boy' and other terms that were racial offensive.

     i.    Ms. Havard spoke out to Sondra Young of the NAACP in 2022, Dr.

Terry Nelson and Dr. Tracie Keesee in 2021-2022 about women officers being sexually

harassed and subjected to misogynistic comments, including possible stalking by fellow

officers.

j.      Ms. Havard spoke with Sharon Knight, CEO of Hope Communities, and

Frank Worthmore, East Colfax Coalition, in 2022 about DPD officers not responding to

calls for service from immigrants, thereby depriving the community of safety based on

their national origin.

k.      Ms. Havard spoke with supervisors, Sondra Young of the NAACP

and Dr. Tracie Keesee in 2022 about Havard's concerns that training for the female

officers was subpar and resulted in the officers not being able to properly perform their

duties for the community.

_Defendants retaliated against Ms. Havard for speaking out_

26.     Several months after speaking out at the Women's Collective in September of

2021 and then asking that criminal and civil charges be investigated for actions revealed at the

Collective meeting, and after speaking out about police inaction with regard to threats against

Councilwoman CdBaca, among other instances of speaking out on matters of public concern,

the Defendants retaliated against Ms. Havard by placing her on an unsubstantiated Performance

Improvement Plan (hereinafter "PIP"), which involved the following:

a.      Defendants placed Ms. Havard on a Performance Improvement Plan

effective March 17, 2022, such plan being replete with false and unsubstantiated

allegations, and without any objective substantiation.

b.      In the PIP, Ms. Havard was falsely characterized and cast as the stereotype

of an angry black woman who was violent, stating that "Department of Safety personnel

have described your behavior as…confrontational, alarming, aggressive, abusive,

dismissive, demeaning, and threatening."

8

c.      Absent from the PIP was any follow-up or substantiation regarding behavioral complaints referenced in the document; nor were there any recommendations regarding alleged conduct/behavioral issues.

d.      Notably, although the PIP states Ms. Havard is aggressive with other law enforcement personnel, conspicuously absent are required or optional resources for anger management, mental health, or counseling.

e.      The PIP states that Ms. Havard's race, gender, and associations were a motivating factor in how the concerns therein presented.

f.      During the pendency of the PIP, which was set to expire on June 17, 2022, Ms. Havard was required to meet with Glenn West twice a week, a requirement not imposed on similarly situated white or male officers.

g.      In addition, Glenn West, Ms. Havard's direct supervisor, implemented the PIP in a retaliatory, discriminatory, and harassing manner, for example, from approximately March 2022 to May 2022, Glenn West, pilloried Ms. Havard with seemingly small "insubordination" infractions to which other similarly situated DPD officer employees were not subject to, such as punctuality citations for being two minutes late to a meeting, the length and position of her shirt sleeves when moving heavy boxes, and applying her initials rather than her full name to informational documents.

h.      During a March 29, 2022, meeting, Glenn West even told Ms. Havard: "If you're going to complain on others, they will complain on you."

i.      Eventually, by April 19, 2022, Glenn West required Ms. Havard, a 24-year veteran of the DPD, to document and enumerate her every action, stating on a supervisory meeting report that she was:

"instructed to provide me a daily list of activities/ events that you are involved in for each working shift. Do this by email and by 1000hrs during your shift, and include the start and end times for each event. In cases where you are notified of an event by short notice, send an additional email notifying me of the change in your schedule. I explained that this is how I will check to see how you are managing your time to ensure the Citywide Impact officers are getting supervisory coverage on Class 2s out in the field."

27.     Defendants also retaliated against Ms. Havard by giving her unsubstantiated and undeserved reprimands and discipline, for example:

a.      On August 10, 2022, Glenn West, Ms. Havard's direct supervisor held a PIP follow up meeting with Ms. Havard in which he unfairly reprimanded her for such things as being two and five minutes late and not setting up a meeting within forty-eight hours of having been asked to do so, when to his own admission Glenn West never gave her a deadline to do so.

b.      On or about August 3, 2022, Glenn West publicly corrected and reprimanded Ms. Havard for failing to comply or ask follow up questions regarding a new uniform policy, a policy about which she had never been informed.

c.      On August 18, 2022, Ms. Havard was notified by Glenn West that she would receive a Journal Entry write-up due to an August 10, 2022 email in which she declined to participate in a *Women In Command* course training, training which she was not required to take.

28.     Defendants also retaliated against Ms. Havard by utilizing the Internal Affairs Bureau (hereinafter "IAB") to intimidate her, for example:

a.      On April 13, 2022, an IAB interview was held regarding an email exchange between an employee and Ms. Havard. Although Ms. Havard was named as a witness in

the investigation, the investigator, Officer Franklin, treated her like a subject of the

investigation, the interview ending with the final disturbing exchange:

> "<u>Carla Havard</u>:  Do you feel like this PIP is targeting?

> <u>Officer Franklin</u>:  Because you are an angry Black woman with behavioral

issues?"

> b.    Subsequently, on May 6, 2022, yet another IAB interview was held was

held regarding an EEO complaint filed by Ms. Havard, in which, again, Ms. Havard was

treated like a suspect, as opposed to as a victim.

.    29.    Amidst all the retaliation and internal investigations, Ms. Havard was trying to

study for the Lieutenant's Exam, which provides a path to promotion in terms of rank and is

only offered about once every three years; not surprisingly Ms. Havard did not succeed in the

examination in large part because of the distraction of the stringent mandates in the PIP.

30.    In 2021-2022, Glenn West made false and damaging statements about Ms.

Havard to others inside and outside DPD in an effort to smear her name and fuel resentment

and contempt for her, causing her not only stress but actually causing concern for her safety on

the job, for example Commander West said that everyone hates Havard and no one would work

with her. Ms. Havard repeatedly expressed concerns to her superiors that this public defamation

caused a lack of support and a failure of assistance to her and her team while performing her

duties, creating an unsafe environment.

31.    During the period 2021-2023, Ms. Havard was excluded from processes and

meetings that she typically attended or participated in, lessening her status and ability to do her

job, for example:

a.      She was excluded from processes, such as those dealing with recruitment and equity unit processes that a person in her position would normally be included in.

b.      During the period 2022, Ms. Havard would be excluded from meetings while her name would be used because of her connection with the community, for example, although Ms. Havard was assigned to the EAP program and the peaks Academy program on recruitment and onboarding, her duties were changed so that she could not attend those meetings, thus having no voice in the activities of the programs.

c.      During 2022, her supervisor, Glenn West, would exclude Ms. Havard from participation in groups such as the Women's Commission and the LGBTQ Commission even though she had been active in women's and LGTQ issues for years, thus excluding her from opportunities to advance her career.

32.     Beginning in April of 2023, while Ms. Havard was on vacation, Defendants started to dismantle her city impact team and reduce her duties and responsibilities, with most of her significant/minority workers and the programs she had created being put under another supervisor.

33.     Once her team was dismantled, Ms. Havard was given a position in which she was to work directly for the executive director of safety's office as some type of liaison, but when she asked about the duties of this role, she was told that they were not known at that time.

34.     Defendants attempted to prevent Ms. Havard from speaking at the Women's Bar Association in 2023, as demonstrated by the following, among other actions:

a.      Defendants became aware that Ms. Havard was to be a keynote speaker at the conference in a mid-April 2023 when Havard mentioned that she would making the

speech in a zoom meeting attended by her supervisor, Glenn West and other DPD officials.

b.      A couple of weeks later on May 1, 2023, before the conference, the DPD served Ms. Havard with an internal affairs complaint alleging numerous EEO violations. Attached to the complaint was a gag order restricting Ms. Havard's speech about the complaint.

c.      Not understanding the extent of the gag order because DPD did not specify the actual complaints received by it, Ms. Havard asked her attorney to contact the City Attorney's Office for clarification.

d.      In the conversation with Ms. Havard's attorney, the assistant city attorney seemed only concerned with Ms. Havard's upcoming Women's Bar Association speech, saying, among other things, that if Ms. Havard were to "name names" in her speech, the DPD would move for her termination.

35.      Failing to stop Ms. Havard from speaking, Defendants took numerous other actions to retaliate against her for speaking out about discrimination, including:

a.      One day after Ms. Havard spoke to the Women's Bar Association, on May 22, 2023, the DPD amended the earlier complaint, adding an additional and more serious charge against Ms. Havard.

b.      On that same day, Ms. Havard was put on leave indefinitely while the DPD investigated the complaints against her.

c.      Even though Ms. Havard retired from the DPD, the Defendants are still investigating the claims against Ms. Havard.  On the basis of the pending claim, the

Defendants have prevented Ms. Havard from securing employment in her chosen

profession, security and law enforcement.

*There is and has been systemic racism in the DPD*

36.     The Denver Police Department has a history of systemic racism, for example:

a.     In the 1920s, the Ku Klux Klan experienced a national revival.

**https://coloradoencyclopedia.org/article/denver-police-department;**

**https://coloradoencyclopedia.org/article/denver-police-department-1859-1933**1859-

**1933#:~:text=The%20Denver%20Police%20Department%20was,gamblers%2C**

**%20thieves%2C%20and %20prostitutes**.  In Colorado, noted Klan members

included Governor Clarence J. Morley**,** Denver mayor Benjamin F. Stapleton.  During

the 1920s, a number of DPD officers were members of the Ku Klux Klan in Denver,

with William J. Candlish, who was police chief of the DPD from 1924 to 1925, being a

Grand Dragon in the KKK.   *"The KKK ruled Denver a century ago. Here's how the*

*hate group's legacy is still being felt in 2021". The Denver Post. 2021-06-06.* Ledgers

of KKK members show that at least 53 Denver police officers were members of the

KKK in the 1920s.  *Id.*

b.     In 2008, newspapers reported on a 1979 video that showed Denver

Police Department Sergeant Arthur Hutchinson addressing a group of police recruits,

using terms such as "ni**ers," "beaners," "greasers" and "homos" to describe them and

asking one woman in the class "Is the real reason you came on here because you just

wanted to have access to 1,400 guys to f*ck?"  Sergeant Hutchinson went on to serve as

the chief of police in Eagle, Colorado for a year, and then as the chief in Black Hawk,

Colorado from 1996 to 2006. *Seventies-era Denver Police video shows racist,*

*homophobic and sexist training practices* By Joe Tone, 22 August 2008,

WestWord.com.

       c.      Former Black officers can relate many stories of racism, for example

there was an instance in which all of the DPD officers at the Denver International

Airport were provided tinted glasses with cameras except the only Black officer, who

was told that he would appear "mean" if he wore tinted glasses.

37.     Upon information and belief, approximately 23 out of 1,435 police officers at the

DPD identify as Black women.

38.     Ms. Havard, as President of the Black Officer' Organization, received

information from black officers at DIA that white officers were making racist complaints and

Fox News was being played in the common area of the roll call room, which encouraged white

officers to engage in conversations that black officers felt were offensive and inappropriate.

39.     It was further reported that Glenn West, a black supervisor, refused to stop racist

comments, saying that the white officers had a First Amendment right to make the comments,

but would discipline black officers who would eventually tire of the offensive comments and

confront the white officer making those racist comments.

40.     It was also reported to Ms. Havard that Glenn West, as the lieutenant at DIA,

would routinely entered the roll call room which included black and white officers and say

loudly "Fuck Black Lives Matter."

*There is and has been and systemic sexism at DPD*

41.     In 2022, 19.6% of the Denver Police Department's patrol staff were female while

females make up 49.9% of Denver residents.



FIGURE 11. Comparing demographics of Denver Police Department patrol officers and Denver residents

Source: Auditor's Office analysis using Denver police employee data as of July 2022 and 2021 population estimates from the U.S. Census Bureau.

Audit Report, *Denver Police Department Police Operations and Staffing*, JUNE 2023.

42.    Since 2017, female officers have resigned at a disproportionate rate from the Denver Police Department, specifically, although female officers made up 19.6% of the department's patrol staff, in 2022, 23.4% of resignations as of November were by women.  *Id.*

43.    The Women's Collective at DPD was formed to advance gender inclusion and identify barriers of such at the DPD.

44.    A Women's Collective meeting was convened on September 27, 2021; in that meeting DPD officers, including Glenn West (Ms. Havard's supervisor), Magen Dodge, Commander of Internal Affairs, and Chief Paul Pazez, reviewed a memorandum circulated to all the participants which outlined numerous specific instances of gender bias, discrimination, and sexual harassment at the DPD.

45.    The memorandum summarized and identified the issues of sex discrimination in the Department and provides in relevant part:

"Sexism and misogyny, as well as other forms of degradation and discrimination, are omnipresent and rampant in the Denver Police Department; it is an extensive issue that deserves commensurate resources. The behaviors extend from the lesser acknowledged, everyday dismissiveness, including lack of recognition/credit stealing and talking over/ignoring, to the more obvious overt harassment, such as inappropriate touching.

16

Women are often treated poorly and are meant to feel unsafe on a regular basis through harassment in the form of unwanted touching, blocking normal movement, verbal abuse, threats, and exclusion. Regardless of the form, the issues contribute to unhealthy, stressful work environments that are detrimental to the mental health of the women within DPD. It also maintains the wide gender gap that currently exists between men and women in leadership within the department."

46.     The memorandum also outlined specific instances of sexual harassment, assault, and battery, including the following:

a.     "My Sgt. regularly caresses and plays with my hair and rubs my back. He has also grabbed my leg multiple times when we are sitting next to each other. This often happens in the presence of my Lt. and other Detectives.

b.     My Sgt. came up behind me and put his hands around my neck and pretended to choke me. He thought it was funny. Once he removed his hands, I placed mine next to my neck on instinct due to a trauma related reaction. He is aware of this trauma. He told me to chill out and put my hands down. It was just a joke."

47.     Finally, the document outlines several climate concerns regarding micro aggressions, derogatory language, and other inappropriate remarks:

"Comments about women's bodies are made daily. The people that make these comments do it openly without any concern that they will be disciplined by superiors.  People use the word tranny, faggot, he-she, cocksucker, retard, and other inappropriate/offense words on a daily basis."

*Ms. Havard was treated differently than white males at DPD*

48.     Ms. Havard was routinely treated differently than similarly situated males, particularly white male officers, for example:

a.     In February of 2023, Ms. Havard -- at the time being the **only** Black female heading up a specialized unit -- received instructions to obtain approval from her

Lieutenant **before** her team could offer assistance to any other team or program, while other specialized units, all of whom were headed by white men, did **not** have this same requirement. Ms. Havard was told by her Lieutenant that this specific demand was made by Glenn West.

    b.    The Defendants also excluded Ms. Havard's team from handling some core functions of its job duties, specifically ordering other DPD units not to use the team despite it being readily available, while similarly situated white male employees, Jeff Mascianglo, Rick Spence, Paul Jimenez, Mike O'Donnell, Brian Jeffers, and staff with the RAVEN unit were not subjected to additional scrutiny nor excluded.

    c.    Ms. Havard's concerns such as violations of policies and practices were ignored and allowed to continue, while similar concerns from white males were addressed.

49.    Ms. Havard was given a performance improvement plan, as well as discipline and reprimands in situations in which male and/or white officers were not disciplined, for example:

    a.    Ms. Havard was disciplined for being a few minutes late to meetings when males would oftentimes not show up and suffered no discipline.

    b.    Ms. Havard was disciplined for supposed uniform violations, for example for having her sleeves rolled up, when male officers would receive no discipline for violations of the uniform policy such as having a different shirt and pants.

50.    The Defendants publicly characterized Ms. Havard as an "angry black woman" who no one likes, as shown by the following examples:

    a.    In the March 17, 2022 PIP, Ms. Havard was falsely characterized and cast as the stereotype of an angry black woman who was violent, the PIP stating "Department of Safety personnel have described your behavior as…confrontational, alarming, aggressive, abusive, dismissive, demeaning, and threatening."

    b.    In her interview with IAB investigator Franklin, Franklin described Ms. Havard as "an angry Black woman with behavioral issues."

51.    Ms. Havard is a "by the book" officer who requires her officers to observe the rules of professionalism and ethics. White male supervisors who do the same are celebrated and described as good leaders.

*Ms. Harvard opposed discrimination at DPD*

52.    Ms. Havard repeatedly spoke out in opposition to discrimination during the time period 2021 through 2023.

53.    In 2021, Ms. Havard spoke to DPD leadership, Dr. Lisa Calderon, community activist and Chief of Staff to Councilwoman Candi CdBaca, and others about the lack of police attention to threats against CdBaca, a Hispanic gay woman, including the fact that police officers in District 2 were saying out loud in a public area that if CdBaca needed help they would not respond, essentially putting that councilwoman's life at risk.

54.    During a Women's Collective meeting held September 27, 2021, attended by many Department chiefs and other leadership staff, including Glenn West, who was the Commander of the Equity Unit, and Megan Dodge, who was the Commander of Internal Affairs, Ms. Havard publicly called for the investigation of some fellow officers regarding discrimination, harassment and sexual misconduct.

55.     Immediately following the September 27 meeting, Ms. Havard called the
Employee Specialist, Becky Lambert conveying to Lambert some of the issues that had been
spoken about and requested that an investigation into policy violations and criminal activity be
launched as a result of what the women had revealed at the Women's Collective Meeting.

56.     On May 21, 2023, Ms. Havard spoke as one of the keynote speakers for the
Colorado Women's Bar Association annual conference in Beaver Creek Colorado on the topic of
environments for women in workplaces where there is little or no racial or gender diversity.  She
was recruited as a keynote speaker because of her advocacy around black and marginalized
women experiences in the workplace.

57.     Ms. Havard mentioned that she would be a keynote speaker at the conference in a
mid-April 2023 zoom meeting attended by her supervisor, Glenn West and other DPD officials,
although she was not speaking as a representative of the DPD.

58.     Ms. Havard opposed discrimination on numerous other occasions, including but
not limited to the following:

    a.     Ms. Havard spoke out to Nadine Bridges of *One Colorado* in 2021 about
    DPD's LGBTQ officers being harassed and subjected to offensive comments.

    b.     Ms. Havard spoke to Chief of Police Pazen, Division Chief Ron Thomas
    and Deputy Manager of Safety Mary Dulacki, as well as to Sondra Young of the
    NAACP, Sylvia Murray, Executive Director of Civil Service Commission, and Regina
    Jackson, Community advocate, in 2021 about DPD minority hiring and recruitment
    practices, including speaking out about a recruiter who had been disciplined for having
    inappropriate sexual relationships with recruits but remained in recruitment.

20

c.    Also in the area of recruitment, Ms. Havard (i) complained about

misrepresentation of DPD's efforts in recruiting minority applicants; (ii) questioned the

training practices and the legitimacy of the report that were being presented to the

Chief's office and the hiring oversight board of the Civil Service Commission; (iii)

accused the recruitment unit of having no criteria for their applicant process; and

(iv)complained about the lack of effort on the part of the recruitment unit to actually

attract black officers.

d.    In 2021, Ms. Havard spoke to Neil Wright, owner of Capitol Cigars, and

Councilman Hines about the DPD's inaction, delay and lack of flexibility addressing

rampant drug use and violence in certain parts of the City affecting the businesses in that

area, which are mostly minority businesses.

e.    Ms. Havard spoke with Sondra Young of the NAACP in 2020-2023,

Alvertis Simmons, community leader, in 2022, Mike Anderson, former police officer,

Dr. Tracie Keesee, former Division Chief -Denver Police; VP Center for Policing

Equity, Selena Dunham, business owner, Regina Jackson, Ken Brown, Pastor of Trinity

Church, and Jeff Fard (Bro Jeff), community leaders, in 2021-2023 regarding the many

complaints of officers committing civil rights violations, particularly in District 2 and

District 5, including complaints that impact teams were profiling and stopping

predominantly black citizens without probable cause and without reasonable suspicion.

f.      Ms. Havard spoke to the ACLU, Dr. Tracie Keesee and Nick Metz,
former Chief of Police of Aurora CO in 2021 about women officers not being covered
on calls and putting their safety at risk.

g.      Ms. Havard spoke to the ACLU in 2021, as well as to Selena Dunham
and Dr. Tracy Keecee, Nick Metz and Dr. Terry Nelson, community leader, about Black
officers being overlooked for positions for which they were qualified, with those
positions often given to underqualified white men or white females

h.      Ms. Havard made complaints to Alvertis Simmons in 2021-2022 and
Division Chief Ron Thomas about the allegations that District 2 police officers were
calling black community members "ni**ers" while interacting with them and that white
officers were calling black men "Boy' and other terms that were racial offensive.

i.      Ms. Havard spoke out to Sondra Young of the NAACP in 2022, Dr.
Terry Nelson and Dr Tracie Keesee in 2021-2022 about women officers being sexually
harassed and subjected to misogynistic comments, including possible stalking by fellow
officers.

j.      Ms. Havard spoke with Sharon Knight, CEO of Hope Communities, and
Frank Worthmore, East Colfax Coalition, in 2022 about DPD officers not responding to
calls for service from immigrants, thereby depriving the community of safety based on
their national origin.

k.      Ms. Havard spoke with supervisors, Sondra Young of the NAACP
and Dr. Tracie Keesee in 2022 about Havard's concerns that training for the female

officers was subpar and resulted in the officers not being able to properly perform their

duties for the community.

59.     Ms. Havard filed an internal EEO complaint against Glenn West in the Spring of

2022, and a complaint to the Office of the Independent Monitor in April of 2022 accusing West

of discrimination and creating a hostile and harassing environment.

*Defendants retaliated against Ms. Havard for opposing discrimination*

60.     Several months after speaking out at the Women's Collective and then asking

that criminal and civil charges be investigated for actions revealed at the Collective meeting,

and after speaking out about police inaction with regard to threats against Councilwoman

CdBaca, a gay Hispanic woman, as well as other instances of opposition to discrimination, the

Defendants retaliated against Ms. Havard by placing her on an unsubstantiated Performance

Improvement Plan (hereinafter "PIP"), which involved the following:

    a.     Defendants placed Ms. Havard on a Performance Improvement Plan,

effective March 17, 2022, which is absolutely replete with false and unsubstantiated

allegations, and is without any objective substantiation.

    b.     In the PIP, Ms. Havard is falsely characterized and cast as the stereotype

of an angry black woman who is violent, the PIP stating "Department of Safety personnel

have described your behavior as…confrontational, alarming, aggressive, abusive,

dismissive, demeaning, and threatening."

    c.     Absent from the PIP was any follow-up or substantiation regarding

behavioral complaints referenced in the document; nor were there any recommendations

regarding alleged conduct/behavioral issues.

d. Notably, although the PIP states Ms. Havard is aggressive with other law enforcement personnel, conspicuously absent are required or optional resources for anger management, mental health, or counseling.

e. The PIP states that Ms. Havard's race, gender, and associations were a motivating factor in how the concerns therein presented.

f. During the pendency of the PIP – which was set to expire on June 17, 2022, Ms. Havard was required to meet with Glenn West twice a week, a requirement not imposed on similarly situated white or male officers.

g. Glenn West, Ms. Havard's direct supervisor, implemented the PIP in a retaliatory, discriminatory, and harassing manner, for example, from approximately March 2022 to May 2022, Glenn West, pilloried Ms. Havard with seemingly small "insubordination" infractions to which other similarly situated DPD officer employees were not subject to, such as punctuality citations for being two minutes late to a meeting, the length and position of her shirt sleeves when moving heavy boxes, and applying her initials rather than her full name to informational documents.

h. During a March 29, 2022, meeting, Glenn West even told Ms. Havard: "If you're going to complain on others, they will complain on you."

i. Eventually, by April 19, 2022, Glenn West required Ms. Havard, a 24-year veteran of the DPD, to document and enumerate her every action, stating on a supervisory meeting report that she had been:

> "instructed to provide me a daily list of activities/ events that you are involved in for each working shift. Do this by email and by 1000hrs during your shift, and include the start and end times for each event. In cases where you are notified of an event by short notice, send an additional email notifying me of the change in your schedule. I explained that this is how I will check to see how you are

managing your time to ensure the Citywide Impact officers are getting supervisory coverage on Class 2s out in the field."

61.    Defendants also retaliated against Ms. Havard by giving her unsubstantiated and undeserved reprimands and discipline, for example:

a.    On August 10, 2022, Glenn West, Ms. Havard's direct supervisor, held a PIP follow-up meeting with Ms. Havard in which he again unfairly reprimanded her for such things as being two and five minutes late and not setting up a meeting within forty-eight hours of having been asked to do so, when to his own admission Glenn West never gave her a deadline to do so.

b.    On or about August 3, 2022, Glenn West publicly corrected and reprimanded Ms. Havard for failing to comply or ask follow up questions regarding a new uniform policy, a policy about which she had not been informed.

c.    On August 18, 2022, Ms. Havard was notified by Glenn West that she would receive a Journal Entry write-up due to an August 10, 2022 email she sent declining to participate in a Women In Command course training, training which she was not required to take.

62.    Defendants also retaliated against Ms. Havard by utilizing the Internal Affairs Bureau to intimidate her, for example:

a.    On April 13, 2022, an IAB interview was held regarding an email exchange between an employee and Ms. Havard. Although Ms. Havard was named as a witness in the investigation, the investigator, Officer Franklin, treated her like a subject of an IAB investigation, the interview ending with the final disturbing exchange:

"Carla Havard:  Do you feel like this PIP is targeting?

<u>Officer Franklin</u>:  Because you are an angry Black woman with behavioral issues?"

b.        Subsequently, on May 6, 2022, yet another IAB interview was held regarding an EEO complaint filed by Ms. Havard in which, again, Ms. Havard was treated like a suspect, as opposed to as a victim.

.        63.        Amidst all the retaliation and internal investigations, Ms. Havard was trying to study for the Lieutenant's Exam, which provides a path to promotion in terms of rank and is only offered about once every three years; not surprisingly Ms. Havard did not succeed in the examination in large part because of the distraction of the stringent mandates in the PIP.

64.        In 2021-2022, Glenn West made false and damaging statements about Ms. Havard to others inside and outside DPD in an effort to smear her name and fuel resentment and contempt for her, causing her not only stress but actually causing concern for her safety on the job, for example West said that everyone hates her and no one would work with her.

65.        During the period 2021-2023, Ms. Havard was excluded from processes and meetings that she typically attended or participated in, lessening her status and ability to do her job, for example:

a.        She was excluded from processes, such as those dealing with recruitment and equity unit processes that a person in her position would normally be included in.

b.        During the period 2022, Ms. Havard would be excluded from meetings while her name would be used because of her connection with the community, for example, although Ms. Havard was assigned to the Peaks Academy program on recruitment and onboarding, her duties were changed so that she could not attend those meetings, thus having no voice in the activities of the program.

c.      During 2022, her supervisor, Glenn West, would exclude Ms. Havard

from participation in groups such as the Women's Commission and the LGBTQ

Commission even though she had been active in women's and LGTQ issues for years,

thus excluding her from opportunities to advance her career.

66.      Beginning in April of 2023, while Ms. Havard was on vacation, Defendants

started to dismantle her city impact team and reduce her duties and responsibilities, with most

of her significant/minority workers and the programs she had created being put under another

supervisor.

67.      Once her team was dismantled, Ms. Havard was given a position in which she

was to work directly for the executive director of safety's office as some type of liaison, but

when she asked about the duties of this role, she was told that they were not known at that time.

68.      Defendants attempted to prevent Ms. Havard from speaking at the Women's Bar

Association in 2023, as demonstrated by the following, among other actions:

a.      Defendants became aware that Ms. Havard was to be a keynote speaker at

the conference in a mid-April 2023 when Havard mentioned that she would making the

speech in a zoom meeting attended by her supervisor, Glenn West and other DPD

officials.

b.      A couple of weeks later on May 1, 2023, before the conference, the DPD

served Ms. Havard with an internal affairs complaint alleging numerous EEO violations.

Attached to the complaint was a gag order restricting Ms. Havard's speech about the

complaint.

c.      Not understanding the extent of the gag order because DPD did not specify the actual complaints received by it, Ms. Havard asked her attorney to contact the City Attorney's Office for clarification.

d.      In the conversation with Ms. Havard's attorney, the assistant city attorney seemed only concerned with Ms. Havard's upcoming Women's Bar Association speech, saying, among other things, that if Ms. Havard were to "name names" in her speech, the DPD would move for her termination.

69.    Failing to stop Ms. Havard from speaking, Defendants took numerous other actions to retaliate against her for speaking out about discrimination, including:

a.      One day after Ms. Havard spoke to the Women's Bar Association, on May 22, 2023, the DPD amended the earlier complaint, adding an additional and more serious charge against Ms. Havard.

b.      On that same day, Ms. Havard was put on leave indefinitely while the DPD investigated the complaints against her.

c.      Even though Ms. Havard retired from the DPD, the Defendants are still investigating the claims against Ms. Havard.  On the basis of the pending claim, the Defendants have prevented Ms. Havard from securing employment in her chosen profession, security and law enforcement.

*Ms. Havard  suffered harassment and a hostile work environment at the DPD*

70.    The Defendants stereotyped Ms. Havard as an angry black woman, as shown by the following examples:

a.      In the March 17, 2022 PIP, Ms. Havard is falsely characterized and cast as the stereotype of an angry black woman who is violent.  The PIP stated that "Department

of Safety personnel have described your behavior as…confrontational, alarming, aggressive, abusive, dismissive, demeaning, and threatening."

b.     In her interview with IAB investigator Franklin, Franklin describes Ms. Havard as "an angry Black woman with behavioral issues."

71.    Ms. Havard is a "by the book" officer who requires her officers to observe the rules of professionalism and ethics, something resented by non-black officers when demanded by a black female supervisor. White male supervisors who do the same are celebrated and described as good leaders.

72.    As a Black and/or female officer at the DPD, Ms. Havard suffered continuing harassment and a hostile work environment at the DPD.

73.    After September of 2022, Ms. Havard began to notice that her duties as supervisor of the Citywide Impact Team were shifting to more patrol-related work and less community engagement work per her direct supervisor Glenn West; rather those duties appeared to be reassigned to a lower ranked black male officer. Ms. Havard continued to advocate for best practices and made inquiries regarding the sudden shift in her work assignments to which she received no clear answer and again began to raise race and gender bias issues.

74.    Ms. Havard was given a Performance Improvement Plan (hereinafter "PIP") effective on March 17, 2022, which is replete with false and unsubstantiated allegations, and is without any objective substantiation.

a.     Absent from the PIP was any follow-up or substantiation regarding behavioral complaints referenced in the document; nor were there any recommendations regarding alleged conduct/behavioral issues.

b.     Notably though the PIP states Ms. Havard is aggressive with other law enforcement personnel, conspicuously absent are required or optional resources for anger management, mental health, or counseling.

c.     The PIP states that Ms. Havard's race, gender, and associations were a motivating factor in how the concerns therein presented.

d.     During the pendency of the PIP – which was set to expire on June 17, 2022, Ms. Havard was required to meet with Glenn West twice a week, a requirement not imposed on similarly situated white or male officers.

75.     Glenn West, Ms. Havard's direct supervisor, implemented the PIP in a retaliatory, discriminatory, and harassing manner, for example, from approximately March 2022 to May 2022, Glenn West, pilloried Ms. Havard with seemingly small "insubordination" infractions to which other similarly situated DPD officer employees were not subject to, such as punctuality citations for being two minutes late to a meeting, the length and position of her shirt sleeves when moving heavy boxes, and applying her initials rather than her full name to informational documents.

76.     During a March 29, 2022, meeting, Glenn West even told Ms. Havard: "If you're going to complain on others, they will complain on you."

77.     Eventually, by April 19, 2022, Glenn West required Ms. Havard, a 24-year veteran of the DPD, to document and enumerate her every action, stating on a supervisory meeting report:

"instructed to provide me a daily list of activities/ events that you are involved in for each working shift. Do this by email and by 1000hrs during your shift, and include the start and end times for each event. In cases where you are notified of an event by short notice, send an additional email notifying me of the change in your schedule. I explained that this is how I will check to see how you are managing your time to ensure the Citywide Impact officers are getting supervisory coverage on Class 2s out in the field."

78.     During this period, much of Ms. Havard's work duties were assigned to a lower ranking male employee in effect denying her authority as the Citywide Impact Team supervisor leading to the dismantling of Havard's Citywide Impact Team and her placement in a "made-up" position that was assigned no duties.

79.     On April 13, 2022, an Internal Affairs Bureau interview was held regarding an email exchange between an employee and Ms. Havard. Although Ms. Havard was named as a witness in the investigation, the investigator, Officer Franklin, treated her like a subject of an IAB investigation, the interview ending with the final disturbing exchange:

"Carla Havard:  Do you feel like this PIP is targeting?

Officer Franklin:  Because you are an angry Black woman with behavioral issues?"

80.     Because of the way her improvement plan was being executed, the nature of her interview with Officer Franklin, and a quarter century of experience with the internal culture of the DPD, Ms. Havard became concerned for her physical safety; for example, on April 23, 2022, at the direction of Ms. Havard, her Counsel, submitted a formal complaint to the Office of the Independ Monitor (OIM), a third party law enforcement oversight agency.

81.     On May 6, 2022, yet another IAB interview was held concerning an EEO complaint filed by Ms. Havard in which Havard was again treated like a suspect and not like the victim she was.

.      82.     Amidst all the retaliation and internal investigations, Ms. Havard was trying to study for the Lieutenant's Exam, which provides a path to promotion in terms of rank and is only offered about once every three years; not surprisingly Ms. Havard did not succeed in the examination in large part because of the distraction of the stringent mandates in the PIP.

83.     On August 10, 2022, Glenn West, Ms. Havard's direct supervisor held a PIP follow up meeting with Ms. Havard in which he again unfairly reprimanded her for such things as being two and five minutes late and not setting up a meeting within forty-eight hours of having been asked to do so, when per his own admission Glenn West never gave her a deadline to do so.

84.     On or about August 3, 2022, Glenn West publicly corrected and reprimanded Ms. Havard for failing to comply or ask follow up questions regarding a new uniform policy, a policy of which she had never been informed.

85.     On August 18, 2022, Ms. Havard was notified by Glenn West that she would receive a Journal Entry write-up due to an August 10, 2022 email she sent declining to participate in a *Women in Command* course training, training which she was not required to take.

*Ms. Havard met administrative prerequisites under Title VII*

86.     Havard filed a complaint with the EEOC on August 23, 2022.

87.     Havard requested and received a right to sue letter from the EEOC on January 8, 2024.

*Municipal Liability*

88.     The Defendants have a long history of racist and sexist policies and practices, which have been publicly chronicled by the media and described by the City Auditor. *See* paragraphs 36-47, above.

89.     Ms. Havard brought her complaints about the racist and sexist environment at the Denver Police Department to high level officials in the organization, including Chief Pazen, the head of Internal Affairs, and to the Independent Monitor, without any substantive response.

90.    The actions here were carried out by high level Denver Police Officials, including Glenn West, a Commander, and Megan Dodge, the present Division Chief of Administration.

*Ms. Havard suffered injuries as a result of Defendants' actions*

91.    Ms. Havard has suffered severe physical and emotional distress because of the actions of Defendants, including:

a.    By May 14, 2022, Ms. Havard's physician ordered her to take medical leave under the Family and Medical Leave Act (FMLA) due to her inability to perform her work duties due to a work-related anxiety and stress disorder, particularly while having anxiety "flare ups."

b.    Throughout May and June 2022, Ms. Havard was often admitted to the hospital due to conditions related to her anxiety and stress disorder; even after Ms. Havard was admitted to the hospital for an emergency related to her work stress, Glenn West cited Ms. Havard for not utilizing the proper protocols to utilize sick and vacation time benefits in her August 10, 2022 PIP follow up.

c.    To this day, Ms. Havard suffers from anxiety and stress-related injuries due to the defamatory remarks made by DPD employee(s) and the retaliatory environment at the DPD.

92.    Havard has suffered economic losses from the Defendants' actions, including loss of wages from employment, in addition to legal fees and costs that will be incurred.

93.    Ms. Havard has suffered damages to her reputation professionally and personally from the actions of Defendants.

94.     Ms. Havard has suffered damages because of the deprivation by a government
entity of her basic constitutional rights.

## VIOLATIONS ALLEGED

95.     As to each of the following claims for relief, paragraphs 1 through 94 above are
incorporated by reference and re-alleged as if fully set forth in each separate claim.

## FIRST CLAIM
## (Violation of the First Amendment as Incorporated in the Fourteenth Amendment to the U.S. Constitution)

96.     Defendants are a municipality and a municipal police department and at all times
relevant to this complaint were acting under color of state law.

97.     In taking the actions described above, especially the actions of retaliating against
her for speaking out about matters of public concern, Defendants violated Havard's rights under
the First Amendment to the United States Constitution, as incorporated by the 14th Amendment.

98.     Defendants took these actions knowing that they were unlawful or in reckless
disregard of their unlawfulness.

99.     Defendants' actions caused harm to Havard, which harm Havard seeks to remedy
through action authorized under 42 U.S.C. §1983.

## SECOND CLAIM
## (Violation of the Title VII)

100.    Defendants are a municipality and municipal police department and at all times
relevant to this complaint were acting under color of state law.

101.    In taking the actions described above, especially the actions of (i) treating Havard
differently on the basis of gender and/or color and/or both, (ii) stereotyping her, (iii) creating a
harassing and hostile work environment and (iv) retaliating against her for opposing

discrimination against her and others, Defendants violated Havard's rights under Title VII of the Civil Rights Act of 1964. Defendants took these actions knowing that they were unlawful or in reckless disregard of their unlawfulness.

102.    Defendants' actions caused harm to Havard, which harm Havard seeks to remedy through action authorized under Title VII of the Civil Rights Act of 1964.

## THIRD CLAIM
### (Violation of the Fourteenth Amendment to the U.S. Constitution (Equal Protection)

103.    Defendants are a municipality and a municipal police department and at all times relevant to this complaint were acting under color of state law.

104.    In taking the actions described above, In taking the actions described above, especially the actions of (i) treating Havard differently on the basis of gender and/or color and/or both, (ii) stereotyping her, (iii) creating a harassing and hostile work environment, and (iv) retaliating against her for opposing discrimination against her and others, Defendants violated Havard's rights under the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution.

105.    Defendants took these actions knowing that they were unlawful or in reckless disregard of their unlawfulness.

106.    Defendants' actions caused harm to Havard, which harm Havard seeks to remedy through action authorized under 42 U.S.C. §1983.

## PRAYER FOR RELIEF

A. In view of all of the preceding, Plaintiff Havard respectfully requests that this Court award, adjudge and decree that:

(1)     The conduct alleged is violative of federal law and of Ms. Havard's rights

thereunder,

(2)     In accordance with federal law, Defendants pay to Ms. Havard an amount

– the exact total of which is presently undetermined – comprised of

(I)     The damages she has sustained and damages she will sustain in

the future as a result of Defendants' violations, economic,

emotional, constitutional and reputational, and

(II)     Exemplary or punitive damages, as allowed under law.

(3)     Ms. Havard be awarded her costs of suit, including reasonable attorneys'

fees and costs,

(4)     Ms. Havard be awarded interest on the above; and

B. Plaintiff Havard have such other, further and different relief as this Court deems just and

proper.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury.

**Dated** this 15th day of March 2024.

Respectfully submitted:

*/s Patricia S. Bangert*

Patricia S. Bangert, Attorney at Law, LLC
501 S. Cherry Street, Suite 1100
Denver, Colorado 80246
Phone: (303) 228-2175
             (303) 947-5155 (direct)
Fax: (720) 728-1253
Email: trish@pbangertlaw.com

*/s Jenipher R. Jones*
Jenipher R. Jones, Esq.
For The People, LLC | A People's Legal Office
Jenipher Jones, Esq.
110 16th Street, Ste. 1400
No. 1001
Denver, CO 80202
*Attorneys for Plaintiff*

Address of Plaintiff:

c/o Patricia S. Bangert, Attorney at Law, LLC